UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| New England Gen-Connect, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-12270 |
| | ) | |
| US Carburetion, Inc., | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGEMENT**

Plaintiff New England Gen-Connect, LLC ("Gen-Connect" or "Plaintiff"), by and through its undersigned attorneys, opposes Defendant US Carburetion, Inc.'s ("US Carb") Motion for Summary Judgement (ECF Doc. 69). As shown below, a genuine dispute exists as to all material facts in dispute.

**I.   FACTS AND BACKGROUND**

Gen-Connect is a small Massachusetts based company which sells generator and generator accessories. Gary Mook Dec. ¶ 4. Typically, generators are constructed to run on a single fuel source, usually gasoline, however, both parties sell products which give consumers the ability to run a single fuel source generator on multiple types of fuel sources. This conversion is done through the installation of what in the industry is known as a "conversion kit". The parties are direct competitors in the generator and generator accessories (conversion kits included) business. US Carb's conversion kits are labeled as "Motor Snorkel" and "Classic Adapters". ECF Doc. 69-4 ¶ 5; ECF Doc. 70 ¶ 8.

Code of Federal Regulations ("CFR") 40 §1054.645 requires special provisions for converting an engine to use an alternate fuel, specifically, that converting a certified new or not

new engine to run on a different fuel type violates CFR 40 §1068.101(a)(1) -(b)(1) if the modified engine is not covered by a certificate of conformity. CFR 40 §1054.645(a) and 40 § 1054.645(b).

In 2015 Gen-Connect hired Intertek Carnot Emissions Services, a leading expert in the United States as to regulations and testing compliance for small engine emissions, to determine if Gen-Connect's conversion kits require a certificate of conformity. Mook Dec. ¶ 9. Gary Price at Intertek routinely consults with the EPA as to the meaning of its regulations and reached out to the EPA for a determination on whether conversion kits, as manufactured and sold by each party, require a certificate of conformity. Exhibit A (Price Dep. 55:22-56:9; 58:1-59:10; 61:25-62:12). Gary Price was told directly by an EPA compliance official that conversion kits did in fact require a certificate of conformity. Gary Price then relayed this information to Gen-Connect. Mook Dec. ¶ 11.

Following the EPA's confirmation that conversion kits were required to receive a certificate of conformity Gen-Connect began the process of testing and acquiring certificates for its products. Mook Dec. ¶¶ 11-15. Gen-Connect obtained certificates under 40 C.F.R. § 1054.645 for a total of three classes of engines it sells: (1) EU2000i, first obtained effective August 17, 2016; (2) EU3000is, first obtained effective April 27, 2016; and (3) EU7000i, first obtained effective April 27, 2016. Mook Dec. ¶ 15. A "certificate of conformity" under 40 C.F.R. § 1054.645 certifies all products falling within the class of engine covered, including kits and generators. Exhibit B (Mook Dep. 89:12-20). US Carburetion has not obtained a "certificate of conformity" under 40 C.F.R. § 1054.645 for the products it sells. ECF Doc. 70 ¶ 9.

As admitted in its own memorandum "the EPA circumscribes the scope of the violation expressly: it only 'applies if such modifications are done to convert the engine to run on a different fuel type,' by an entity constituting a 'manufacturer of engines and equipment.' 40 C.F.R. §

1054.645 (emphasis added)". ECF Doc. 67 p. 6. US Carb was manufacturing, advertising, and selling generators with its Motor Snorkel pre-installed up until at least January of 2017. Exhibit D (Shortell Dec. ¶ 10). This is a minimum eight months in which US Carb was manufacturing, advertising, and selling generators modified to run on a different fuel without a certificate of conformity, which US Carb admits violates 40 C.F.R. § 1054.645, in competition with Gen-Connect. This timeframe includes the entire fall and winter seasons which are the busiest in the industry. Mook Dec. ¶ 22. Sometime after the winter of 2017 US Carb began to no longer advertise its generators with its Motor Snorkel pre-installed.

At no time has US Carb ceased manufacturing and selling its conversion kits. These kits are sold as a fuel system component part independent of the engine, and US Carburetion ships them to customers without having applied them to the engine. ECF Doc. 69-4 ¶ 6; ECF Doc. 70 ¶ 10. US Carb was first made aware of the EPA regulations concerning a certificate of conformity and its products and at least as early as May of 2016. Exhibit C. Since this time US Carb has not reached out to anyone at the EPA to investigate or confirm whether or not their kits require a certificate of conformity. Id. Instead of sending the EPA an email, US Carb has elected to spend money on attorney, court, and expert fees to be willfully ignorant as to whether their kits require a certificate of conformity. This decision is done for the sole purpose to be able sell goods at a lower price and maximize profit.

In order to obtain its certificates of conformity and legally sell its products Gen-Connect had to spend over $92,000 for emissions testing, posting the mandatory EPA bond ($25,000), processing fees, and EPA certificates. Mook Dec. ¶ 27. Gen-Connect was forced to take its non-certified products off the market between January 2016 and August 2016 while they obtained certification for its products, and during this time US Carb continued selling its non-certified

3

products. Mook Dec. ¶ 25. This decision lead to substantial damage to Gen-Connect's reputation as customers were confused as to why they could no longer buy their generators and kits and even inquired if Gen-Connect was going out of business. Id. At the same time, it gave US Carb essentially an exclusive market for selling its conversion kits and converted generators and they were the only option for the vast majority of Gen-Connect customers as US Carb specializes in these types of kits and generators. Id. This resulted in a significant windfall for US Carb and corresponding significant loss of sales for Gen-Connect. Gen-Connect suffered a net loss of $329,000 with a gross profit loss of $94,000 during this time. Mook Dec. ¶ 26. Gen-Connect has further been damaged by lost opportunity in the amount of $211,000 as they were unable to invest the $92,000 certification investment into product development. Mook Dec. ¶ 28.

Starting in 2016, Gen-Connect had to raise the price for all of its alternate fueled products comprised of the EU2000is generators and kits an extra $100, and the EU3000is and EU7000is generators and kits an extra $200 each. Mook Dec. ¶ 29. The sole reason for this price increase was to re-coup the engineering, testing and certification costs for the EPA certificate of conformity. Id. The price increases caused Gen-Connect's kits to be on average approximately 150% more expensive than US Carb. Mook Dec. ¶¶ 30-31.

US Carb's contention that others in the industry have not obtained certificates for their kits is simply false. Exhibit E; Exhibit H. Others in the industry are starting to, or have been, certifying their kits as required by the EPA regulations. The decision by Gen-Connect to certify its kits is costly and having to compete against US Carb has resulted in significant financial damage. The parties both sell kits for the Honda EU2000i, EU3000is, EU7000i. Mook Dec. ¶ 20. US Carb's claim that they do not sell any kit compatible with the EU7000i is contradicted by their own online listing for this exact product. Exhibit F.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Washington v. Amand*, Civil Action No. 11-10771-PBS, 2018 WL 1718629, at *2 (D. Mass. Apr. 9, 2018) (quoting Fed. R. Civ. P. 56(a)). "To succeed on a motion for summary judgment, the moving party must demonstrate that there is an 'absence of evidence to support the nonmoving party's case.'" Id. (quoting *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir. 2000)); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial." *Washington*, 2018 WL 1718629, at *2 (citing *Quinones v. Buick*, 436 F.3d 284, 289 (1st Cir. 2006)). A genuine dispute exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986)). "In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party." *Cabot v. Lewis*, 241 F. Supp. 3d 239, 247–48 (D. Mass. 2017).

## III. ARGUMENT

**A. US Carb has and continues to willfully violate EPA and Federal Regulations through the past and present sale of its generator and generator accessories.**

    **i.    US Carb sold converted engines in clear violation of 40 C.F.R. § 1068.101 and 40 C.F.R. § 1054.645**

40 C.F.R. § 1054.645 generally provides that converting certain "small nonroad spark-ignition" engines to run on alternate fuels, without a "certificate of conformity," violates 40 C.F.R. § 1068.101. The EPA circumscribes the scope of the violation expressly: it only "applies if such

5

modifications are done to convert the engine to run on a different fuel type," by an entity constituting a "manufacturer of engines and equipment." 40 C.F.R. § 1054.645; 40 C.F.R § 1054.2 ("Who is responsible for compliance?"). As discussed above US Carb admits that manufactures which modify the engines fuel source require a certificate. US Carb admits they do not have any.

US Carb's Motor Snorkel enables a gasoline engine in a generator to operate on alternative fuels. Exhibit C. US Carb glosses over the fact that they were manufacturing, advertising, and selling generators with its motor snorkel installed, exhibits of these advertisements were included with Plaintiff's Complaint (ECF Doc. 1-1) and Amended Complaint (ECF Doc. 14-2), during the time complained of in Plaintiff's Amended Complaint. US Carb's website shows it selling the products well after the filing of this suit. See Exhibit D (Shortell Dec. ¶ 10). These sales were all done without a certificate of conformity, as US Carb admits they have none, and were all in in clear violation of 40 C.F.R. § 1054.645 and § 1068.101.

US Carb has alleged that they made the decision to phase out selling generators with the Motor Snorkel installed prior to the litigation, however, they did not stop advertising and selling these generators until months (at least) after the filling of the litigation and Gen-Connect noticing them of their violations of 40 C.F.R. § 1054.645 and § 1068.101. ECF Doc. 70 ¶ 9.

The idea that there is no genuine dispute as to material fact, in US Carb's favor, as to whether or not these sales violated 40 C.F.R. § 1054.645 and § 1068.101 is preposterous.

    **ii.**   **Conversion kit manufacturer are required to obtain a certificate of conformity for their kits.**

US Carb's contention that the EPA regulations, specifically 40 C.F.R. § 1054.645 and § 1068.101, do not require entities selling devices which control or tamper with the emissions of an engine (generator) to obtain a certificate of conformity for said devices is contrary to the direct language of the EPA provisions. The language which US Carb bases its entire argument on is

6

completely silent as to whether conversion kits require a certificate of conformity, the section states: "Entities producing conversion kits may obtain certificates of conformity ***for the converted engine***." 40 C.F.R. § 1054.645(e) (emphasis added). The section is clear in stating that a certificate may be obtained for the engine which is converted, but nowhere does it say it "may" or may not be obtained for the actual conversion kit.

The US Carb "Motor Snorkel" and "Classic Adapters" are fuel system components which attach to, and modify the, fuel line of a generator, and then mix the fuel from the tank to the combustion chamber. Fuel system means all components involved in transporting, metering, and mixing the fuel from the fuel tank to the combustion chamber(s), including the fuel tank, fuel tank cap, fuel pump, fuel filters, fuel lines, carburetor or fuel-injection components, and all fuel-system vents. 40 C.F.R. § 1054.801 (What definitions apply to this part?). US Carb even describes their kits as components numerous times. ECF Doc. 69-4 ¶ 10; ECF Doc. 70 ¶ 10.

Certification requirements for fuel system component manufacturers are described in 40 CFR part 1060. Both parties' products, for the purposes of EPA regulations, are deemed "Small SI", which means relating to engines that are subject to emission standards in 40 CFR part 90 or 1054. 40 CFR 1060.801 (What definitions apply to this part?). The EPA regulations are clear that Small SI component manufacturers *must certify* their fuel lines and fuel tanks intended for Small SI engines and *equipment* under this part 1060, except as allowed by § 1060.601(f)[1]. 40 CFR 1060.5 (e)(1) (Do the requirements of this part apply to me?) (emphasis added). As a component manufacturer US Carb is required to obtain a certificate of conformity for its fuel system components (kits). Nothing in this language suggests that obtaining a certificate is choice.

---

[1] The exemption provided by 1060.601(f) states: "If you manufacture fuel lines or fuel tanks that are subject to the requirements of this part as described in paragraph (a) of this section, 40 CFR 1068.101(a) does not prohibit you from shipping your products directly to an equipment manufacturer or another manufacturer from which you have received a written commitment to be responsible for certifying the components as required under this part 1060." 40 C.F.R. 1060.601(f). US Carb has never stated they received this written commitment, nor have they produced any such commitments during the discovery process.

7

US Carb relies on the report of an "expert", Thomas Miller ("Mr. Miller"), to support its interpretation of "may" as it applies to 40 C.F.R. § 1054.645. To say Mr. Miller's report was lacking in thoroughness would be an understatement[2]. Additionally, Mr. Miller's own deposition disqualified himself as an expert on what he purported to be an expert on. Mr. Miller stated that he was retained as an expert in the usage of a word in the English language and in the same breath stated: "I'm not an expert in the exact usage of the English language in writing prose and other forms of writing." Exhibit G (Miller Depo. 37:2-19). To call Mr. Miller an expert on this subject is rather disingenuous given his comments in his deposition. Furthermore, as discussed above the section of the regulation reported on Mr. Miller clearly states: "Entities producing conversion kits may obtain certificates of conformity _**for**_ the converted engine." 40 C.F.R. § 1054.645(e) (emphasis added). This section provides no information as to whether or not the conversion kits themselves require a certificate of conformity or not, only whether the converted engine does.

In US Carb's deposition of Gary Price, he stated that the usage of "may" 40 C.F.R. § 1054.645(e) and whether its usage made it an option to obtain a certificate for conversion kits was "part of the specific question" asked to the EPA in relation to conversion kits. Exhibit A (Price Depo. 61:25-62:12) Gary Price stated that the EPA confirmed that certification was required. Id. The EPA itself debunks US Carb's farfetched idea that obtaining a certificate for its kits was some sort of option based on a single term irrelevant to the actual kits.

Additionally, as discussed in Gen-Connect's Motion for Preliminary Injunction (ECF Doc. 43), Gen-Connect emailed Cleophas Jackson, Director of the Gasoline Engine Compliance Center,

---

[2] The EPA regulations set forth in the Federal Register contains 1,099 parts all of which contain multiple subparts, out of all those parts and subparts Mr. Miller's report contained a total of two citations to the use of "may". These two citations simply highlighted the word "may" in green and "shall" in yellow and were followed by the very simple statement from Mr. Miller: "The use of "shall", highlighted in yellow, and "may", highlighted in green, provide clear instruction to the regulator and the regulated entity as to what is required for compliance ("shall"), and what is discretionary ("may") for the regulator or regulated entity." Neither of these citations are in 40 C.F.R. § 1054.645 despite Mr. Miller admitting there are numerous uses of "may" in that regulation. Exhibit G (Miller Depo. 41:23-42:20). Despite Mr. Miller admitting that there is no singular universal meaning for the word "may". Exhibit G (Miller Depo. 36:19-22). The lack of effort and detail speaks for itself.

Compliance Division, United States Environmental Protection Agency, to discuss whether US Carb is required to have a certificate of conformity for the conversion kits they sell. Mr. Jackson, in his email exchange with President of Gen-Connect, confirms that all conversion kits with an adjustable fuel/air mixture valve would violate CFR 40 § 1068.101(b) per CFR 40 § 1054.645(b) (Mook Declaration ¶ 40, Mook Dec. Ex. F). As admitted by US Carb all of its conversion kits contain an adjustable fuel/air mixture valve and that these kits do not have a certificate of conformity. Therefore, it is undeniable that US Carb's conversion kits require a certificate of conformity to sells its kits and US Carb does not have any.

Based on the language of the EPA regulations a genuine dispute as to material fact, i.e. the interruption of 40 C.F.R. § 1054.645 and § 1068.101, clearly exists and summary judgement cannot be granted as to this issue.

### B. US Carburetion's Unfair and Deceptive Acts Occurred Primarily and Substantially in Massachusetts

A defendant who contests application of Section 11 has the burden of showing that its alleged misconduct occurred primarily and substantially outside Massachusetts. *Yankee Candle Co. v. Bridgewater Candle Co*., 107 F.Supp.2d 82, 88 (D. Mass. 2000).

As the Supreme Judicial Court of Massachusetts has proclaimed,

> Whether the 'actions and transactions [constituting a Sec. 11 claim] occurred primarily and substantially within the commonwealth' is not a determination that can be reduced to any precise formula…Any determination will be fact intensive and unique to the case.

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp*., 438 Mass. 459, 472-73 (2003).

The Supreme Judicial Court in Kuwaiti went on to explain that application of Sect. 11 requires:

> ...an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire Sec. 11 claim, determine whether

the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

*Id.* at 473.

The center of gravity analysis is not based on a formula "identified by any particular factor or factors" because a significant factor that exists in one case may not exist in another. *Id.* In all events, however, the focus of the inquiry should be on 'the purpose and scope' of Chapter 93A. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009) (quoting *Kuwaiti,* 781 N.E.2d at 799).

Defendant relies solely on where the Defendant is located and where its sales take places, but completely ignore where the harm and the consequences of the deceptive acts have occurred. "[A]ttempts, however, to single out particular factors that might control the functional inquiry and then to place these factors in some order of importance, are necessarily not fully satisfactory." *Kuwaiti*, 781 N.E.2d at 799 (quoting *Sonesta Int'l Hotels Corp. v. Cent. Fla. Investments, Inc.*, 712 N.E.2d 607, 611 (Mass. App. Ct. 1999)). Defendants' argument that the alleged unfair practices did not occur primarily and substantially in Massachusetts because only a small portion of their sales were to Massachusetts consumers would, if adopted, also bar any consumer protection action against them in any state, because their sales were spread over the entire United States. Chapter 93A cannot be interpreted to provide immunity merely because the actionable sales were nationwide.

A Massachusetts company deprived of sales is relevant to analysis. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir.2009); *Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1265-66 (1st Cir. 1990). As discussed above, Gen-Connect has lost a substantial amount of money due to the deceptive and unfair acts of US Carb. This was caused not only by lost sales during the period of certification, but also continued lost sales due to Gen-

Connect having to raise its prices to recoup its ongoing and previously spent certification costs. Costs which US Carb are intentionally avoiding in order to undercut Gen-Connect.

The focus of the inquiry as to the center of gravity should be on 'the purpose and scope' of Chapter 93A. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009) (quoting *Kuwaiti,* 781 N.E.2d at 799). The purpose of 93A is to instill a general duty of good faith and fair dealing in business transactions. *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 299, 408 N.E.2d 1370 (1980). Therefore, the center of gravity in this case is Massachusetts as the purpose of 93A is ensure fair dealings in business transactions and protect business against those violating the law and dealing unfairly. Gen-Connect's only office is in Massachusetts. Mook Dec. ¶ 33. The vast majority of its parts suppliers are located in Massachusetts, and 74.8% of the total sale price of its lost revenue in 2016 would have been a combination of profit margin, parts bought from Massachusetts suppliers and parts fabricated in Massachusetts. Mook Dec. ¶ 35.

Gen-Connect takes on average 85% of its orders by dollar volume for kits and generators by phone in its offices in Massachusetts. Mook Dec. ¶ 34. The vast majority of Gen-Connect's expenses occur directly in Massachusetts and they receive discounts based on volume for many such expenses from Massachusetts companies. Mook Dec. ¶ 35. All products we sell are shipped from our Massachusetts single location via drivers and sorters substantially living in Massachusetts. Id.

All of the harm caused by US Carb's actions is being felt in Massachusetts and has a deep impact on the Massachusetts economy, not only to Gen-Connect. *Back Bay Farm, LLC v. Collucio*, 230 F.Supp.2d 176, 188 (D.Mass.2002) (citing *Amcel Corp. v. Int'l Executive Sales, Inc.*, 170 F.3d 32, 36 (1st Cir.1999) (noting that the plaintiff's location in Massachusetts and its claim of injury

in Massachusetts raises a reasonable chance that the plaintiff would prevail on the "primarily and substantially" issue).

This is not a case where a company is making false advertisements and deceiving costumers; the purchasers of US Carb's products, while their safety is at risk, are not being deceived by US Carb, in fact they are able to buy a cheaper product because of US Carb's violation of EPA regulations. Therefore, the fact that its customers are located throughout the country is not relevant to the center of gravity determination.

Furthermore, this case is not analogous to *Gulf Oil*, as none of the plaintiff's gasoline stations in *Gulf Oil* were located in Massachusetts, and it was where the stations were located where the decreased sales and reputation more accurately was being "felt." *Gulf Oil Ltd. P'ship v. Petroleum Mktg. Grp., Inc.*, No. CV 17-10813-GAO, 2018 WL 1587302, at *2-3 (D. Mass. Mar. 30, 2018) (O'Toole, J.). As opposed to *Gulf Oil*, Gen-Connect's revenue and reputational losses have been inflicted in Massachusetts and only Massachusetts.

A genuine dispute as to material fact as to whether the center of gravity for Gen-Connect's 93A claim occurred primarily and substantially in Massachusetts exists and summary judgement cannot be granted as to this issue.

**C.     Gen-Connect's claim for relief falls under the 93A umbrella for deceptive and unfair conduct giving rise to a Section 11 claim.**

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). A successful claim under Chapter 93A requires a showing of (1) a deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the consumer, and (3) a causal connection between the defendant's deceptive act or practice and the consumer's injury. *Casavant v. Norwegian Cruise Line*, Ltd., 76 Mass. App. Ct. 73, 76 (2009),

aff'd, 460 Mass. 500 (2011) (citing G.L. c. 93A, § 9); H*ershenow v. Enterprise Rent-A-Car Co. of Bos., Inc.*, 445 Mass. 790, 797 (2006)).

For Gen-Connect's 93A claim to survive summary judgment, there must be some conduct alleged that falls "within at least the penumbra of some common law, statutory, or other established concept of unfairness ... [or] is immoral, unethical, oppressive, or unscrupulous." *Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722, 729, 532 N.E.2d 660 (1989).

A violation of an EPA regulation that is unfair or deceptive in and of itself can create a viable claim under Chapter 93A. See *Morris v. BAC Home Loans Servicing, L.P.*, 775 F.Supp.2d 255, 259, 2011 WL 1226974, *3 (D.Mass. April 4, 2011) (citing *Bosque v. Wells Fargo Bank, N.A*., 762 F.Supp.2d 342, 352-54 (D.Mass.2011) (denying motion to dismiss Chapter 93A claim arising out of HAMP application). The plaintiff must also show "that 'recovery under [chapter] 93A is compatible with the objectives and enforcement mechanisms of the underlying statute.'" *Ording v. BAC Home Loans Servicing, LP*, No. 10–10670, 2011 WL 99016, at *6 (D.Mass. Jan. 10, 2011) (*quoting Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co.,* 56 Mass App.Ct. 853, 780 N.E.2d 479, 483 (2002)); *see also J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F.Supp.2d 119, 142 (D.Mass.2005).

Chapter 93A "was 'designed to encourage more equitable behavior in the marketplace.'" *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir.2000) (quoting *Arthur D. Little, Inc. v. Dooyang Corp*., 147 F.3d 47, 54 (1st Cir.1998). Violating a federal regulation to enable your business to sell goods at a lower price than your competitor is the exact type of conduct which 93A was instituted to protect.

One of the most puzzling and concerning statements, which US Carb has reiterated in a number of pleadings in this case, is that if US Carb violated the EPA regulations it is simply a "mere 'technical' violation" of the law and therefore should not be bothered with by this Court. US Carb may not take the safety of consumers and the protection of the environment seriously, and may view the EPA regulations as mere technicalities, but Gen-Connect, the EPA, and this Court are not as callous to these things as US Carb.

Gen-Connect brought nearly identical claims against three (3) companies in this Court, two (2) agreed to permanent injunctions to stop selling its products which require a certificate of conformity until it received them, US Carb, the third company, has steadfastly refused to do so. In fact, US Carb has steadfastly refused to even contact the EPA to determine if its kits require a certificate of conformity, which US Carb could do through a simple email to the EPA. This is not an issue of negligence, or mere oversight by US Carb, this is a willful disregard of the law in order to be able to continue to undercut competitor prices.

Additionally, US Carb's argument that Gen-Connect's Section 11 claim fails because it does not meet the threshold for misconduct under 93A is recycled, almost verbatim, from its motion to dismiss. ECF Doc. 17. This Court has already dismissed this argument in holding that "a complaint by one business that a competitor has lowered its own costs as a direct result of its violation of law and with lowered costs is undercutting law-abiding competition plausibly states a claim for unfair competition under § 11." ECF Doc. 36 p 3. Whether US Carb has violated the EPA regulations complained of in this suit may be in question and but if they have there is no question it meets the threshold for misconduct under 93A, therefore, US Carb's motion should be dismissed on this issue.

### D. US Carb Did Cause Gen-Connect's Claimed Damages

#### i) Causation

This court has consistently recognized that, to warrant an award of damages under G.L. c. 93A, there must be a "causal connection between the seller's deception and the buyer's loss." *Kohl v. Silver Lake Motors, Inc.*, 369 Mass. 795, 801, 343 N.E.2d 375 (1976); *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 503, 952 N.E.2d 908 (2011) (stating that a Chapter 93A plaintiff must show "a causal connection between the deception and the loss"); *See Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 695–696, 322 N.E.2d 768 (1975).

Gen-Connect is losing sales to US Carb due to the fact Gen-Connect has to sell its directly competitive products at a 150% mark up to US Carb's. US Carb is able to maintain its price point because it is violating the law by failing to certify its products and therefore not incur the six figure costs associated with certification. The idea that there is not a causal connection between US Carb's action (or inaction in this case) and Gen-Connect's loss is absurd. If US Carb was playing on a level playing field Gen-Connect could adequately compete with them. As with most industries price is an essential purchasing decision for consumers of the products. Customers have reported their issues with the prices directly to Gen-Connect and asking, "do they ever go on sale" and "why are they so expensive?". Mook Dec. ¶ 30. Approximately half of the customers that call about Gen-Connect's kits do not end up buying one citing cost over other kits, even specifically citing the US Carb kit. Id.

Therefore, there is a causal connection between US Carb's deception and Gen-Connect's loss, therefore, US Carb's motion should be dismissed on this issue.

**ii) Damages**

Gen-Connect has extensively laid out how, and how much, they have been damaged by having to directly compete with US Carb, who is able to sell their products at 150% less than Gen-Connect due to their failure to certify their products. US Carb makes the self-serving statement, without any support, that if they had certified their products they would not have raised their prices to recoup their six figure certification costs. This statement makes no sense from a business or financial stand point.

Starting in 2016, Gen-Connect had to raise the price for all of its alternate fueled products comprised of the EU2000is generators and kits an extra $100, and the EU3000is and EU7000is generators and kits an extra $200 each. Mook Dec. ¶ 29. The sole reason for this price increase was to re-coup and account for the past, and on-going, engineering, testing and certification costs for the EPA certificate of conformity. Id. The price increases caused Gen-Connect's kits to be on average approximately 150% more expensive than US Carb. Mook Dec. ¶ 31. The idea that Gen-Connect has benefited financially from obtaining certificates is unsupported and ridiculous. If a customer sees one kit and then another competing kit priced 150% higher the customer is going to purchase the cheaper good the vast majority of the time. Mook Dec. ¶ 21.

Gen-Connect undoubtedly has shown damages based on US Carb's conduct and the fact that US Carb is still selling uncertified products at a much cheaper price these damages are ongoing and have not ceased. Simply put, if US Carb obtained certificates they would have to cease selling goods during the certification process, the price of US Carb's products would have to increase to be relatively equal to that of Gen-Connect.

Therefore, US Carb's has caused quantifiable financial damages to Gen-Connect, therefore, US Carb's motion should be dismissed on this issue.

### E. Primary Jurisdiction

No fixed formula exists for applying the doctrine of primary jurisdiction. *Am. Auto. Mfrs. Ass'n v. Massachusetts Dep't of Envtl. Prot.*, 163 F.3d 74, 80–81 (1st Cir. 1998) quoting *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63-64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)

Gen-Connect's is asserting that US Carb's failure to comply with the EPA regulation is in violation of a Massachusetts statute. Which is why Gen-Connect brought this before a Massachusetts court, which is the Court that has the most familiarity with the 93A statute and its application to business committing acts within its jurisdiction. The goal of national uniformity is maintained by this Court retaining jurisdiction as Gen-Connect is requesting the Court to only determine the regulation's applicability to a Massachusetts statute, not a federal one.

Furthermore, the following factors help to "guide the decision whether or not to refer a matter to an agency under the primary jurisdiction doctrine," *Commonwealth of Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir.1995), especially when the matter involves questions of fact:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

*Id.* (quoting *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 580 (1st Cir.1979)).

As discussed above the EPA, through two officials, has weighed in on whether conversion kits require a certificate of conformity. Exhibit X.

However, if the Court is to determine that this issue is within the primary jurisdiction they should stay the proceeding and refer it to the EPA for review:

> if a court concludes that an issue raised in an action before the court is within the primary jurisdiction of an agency, the court will defer any decision in the action before it until the agency has addressed the issue that is within its primary jurisdiction. The

court retains jurisdiction over the dispute itself and all other issues raised by the dispute, but it cannot resolve that dispute until the agency has resolved the issue that is in its primary jurisdiction.

2 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise 271 (3d ed.1994); *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1360 (9th Cir.1987) (stating that the court is " 'under a duty to stay its proceedings pending ... review' of the agency's findings") (quoting *Pennsylvania R.R. v. United States*, 363 U.S. 202, 206, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960)); *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 269 (7th Cir.1984) (noting that "when primary jurisdiction is invoked ... the agency proceedings are not considered complete ... until judicial review of the agency's determination is complete ...")

## Conclusion

WHEREFORE, Gen-Connect hereby requests that US Carb's Motion for Summary Judgement be denied.

Date: June 15, 2018

Respectfully submitted by,
Attorney for Plaintiff
New England Gen-Connect, LLC

/s/ Brendan M. Shortell
Brendan M. Shortell (BBO# 675851)
Lambert & Associates
92 State Street, Suite 200
Boston, MA 02109
Telephone: 617.720.0091
Facsimile: 617.7206307
Shortell@lambertpatentlaw.com

## CERTIFICATE OF SERVICE

I certify that I served the foregoing on counsel of record through the Court's ECF system on June 15, 2017.

/s/ Brendan M. Shortell